## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MORAD TAHBAZ and VIDA TAHBAZ, | ) | Case No. 3:24-CV-31 (KAD) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VIGILANT INS. CO., and FEDERAL INS. CO., | ) | MARCH 28, 2025 |
| *Defendants*. | ) | |

### <u>MEMORANDUM OF DECISION</u>
### RE: DEFENDANTS' MOTION TO DISMISS (ECF NO. 19)

Kari A. Dooley, United States District Judge:

In this coverage dispute, Plaintiffs Morad Tahbaz ("Mr. Tahbaz") and Vida Tahbaz ("Mrs. Tahbaz") allege that Defendants Vigilant Insurance Company (d/b/a Chubb Corporation) and Federal Insurance Company (collectively, "Defendants" or "Chubb") breached their obligations under Plaintiffs' comprehensive homeowners insurance policy by improperly denying coverage stemming from Mr. Tahbaz's prosecution and wrongful detention by the Islamic Revolutionary Guard Corp ("IRGC") on fabricated charges of espionage. Specifically, the Complaint sounds in six counts: (1) breach of contract (as to Plaintiffs' Personal Liability coverage); (2) breach of contract (as to Plaintiffs' Kidnap Expenses coverage); (3) breach of contract (as to Plaintiffs' Family Protection coverage); (4) breach of contract (as to Plaintiffs' Uninsured/Underinsured liability coverage); (5) breach of the duty of good faith and fair dealing; and (6) unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practice Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). Defendants have filed a Motion to Dismiss the Complaint in its entirety, with prejudice, on the grounds that the policies at issue unambiguously do not provide coverage for the Plaintiffs' claimed losses.

For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Facts and Procedural History**

The Court accepts as true the allegations set forth in the Complaint, which are as follows.

<u>The Policies</u>

In November 2017, Defendants issued to Plaintiffs both a "Masterpiece Homeowners" insurance policy (Policy No. 11354451-08) (the "Homeowners Policy"), as well as a "Masterpiece Excess Liability" insurance policy (Policy No. 11354451-09) (the "Umbrella Policy") (collectively, the "Policies"). Complaint ("Compl."), ECF No. 1, at ¶ 27. The "policy period" for

the Policies was November 12, 2017 to November 12, 2018, and both Plaintiffs are a "covered person" under the Policies. *Id.* at ¶¶ 28–29.

As relevant here, the Policies provide four categories of coverage:

> (1) Personal Liability Coverage, which includes coverage for costs to defend certain legal proceedings; (2) Kidnap Expenses, which includes coverage for the "wrongful taking" of a covered person; (3) Family Protection Coverage, which includes coverage for certain losses resulting from "home invasion"; and (4) Uninsured/Underinsured Liability Coverage, which includes coverage for certain personal injuries for which a covered person is legally entitled to receive compensation.

*Id.* at ¶ 33.

More precisely, the Personal Liability coverage under the Homeowners Policy provides that Defendants "will defend a covered person against any suit seeking covered damages for personal injury or property damage." *Id.* at ¶ 36. The Kidnap Expenses coverage under the Homeowners Policy, which is located within the Personal Liability coverage section, requires Defendants to pay "for kidnap expenses a covered person incurs solely and directly as a result of a kidnap and ransom occurrence," but excludes coverage if the occurrence took place at "those places listed on the United States State Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence." *Id.* at ¶¶ 40–41. The Family Protection coverage under the Policies includes "Home Invasion" coverage, which requires Defendants to "pay for home invasion expenses you, a family member, or your guest incur solely and directly as a result of a home invasion occurrence." *Id.* at ¶ 44. The Umbrella Policy includes $1 million in Uninsured/Underinsured Liability coverage, which requires Defendants to cover "bodily injury and personal injury you or a family member are legally entitled to receive from an uninsured or underinsured negligent person caused by an occurrence." *Id.* at ¶¶ 47, 50.

Mr. Tahbaz's Detention and the IRGC Show Trial

In January 2018, Plaintiffs were traveling in Iran as part of wildlife conservation efforts in support of the Persian Wildlife Heritage Foundation, an organization co-founded by Mr. Tahbaz and dedicated to protecting endangered species in Iran. *Id.* at ¶ 10. On January 10, 2018, Mr. Tahbaz was wrongfully arrested and detained by the IRGC on falsified espionage charges. *Id.* at ¶¶ 11, 14. Specifically, the IRGC asserted that Mr. Tahbaz's "efforts to photograph endangered species were a guise to illegally access and collect information within numerous sensitive sites in Iranian territory," and accused Mr. Tahbaz of coordinating and funding the efforts of others engaged in similar activities. *Id.* at ¶ 14. That same day, IRGC agents ransacked the Plaintiffs' temporary residence in Iran and subjected Mrs. Tahbaz—who was present at the residence—to threats of violence. *Id.* at ¶ 13.

As a result of Mr. Tahbaz's charges, a show trial was conducted in the IRGC's Revolutionary Courts (the "IRGC Show Trial"), at which Mr. Tahbaz was not permitted to present evidence or witnesses. *Id.* at ¶ 16. Despite his demonstrable innocence, Mr. Tahbaz was convicted and sentenced to ten years' of detention and a $600,000 monetary judgment. *Id.* at ¶ 18. On September 18, 2023, following nearly six years of wrongful detention by the IRGC, Mr. Tahbaz was released as part of a diplomatic agreement, and both Plaintiffs were permitted to leave Iran and return to Connecticut. *Id.* at ¶ 26.

Before, during, and after the IRGC Show Trial, Mr. Tahbaz was held at the notorious Evin prison, where he was "subjected to torture, prolonged solitary confinement, death threats, and other extreme techniques for interrogation and punishment." *Id.* at ¶ 20. As a result, Mr. Tahbaz suffered numerous physical and psychological injuries. *Id.* at ¶ 23. Mr. Tahbaz was also denied medical care for prostate cancer and "other significant ailments," including the necessary use of a

catheter for his medical condition. *Id.* While Mr. Tahbaz was detained, Mrs. Tahbaz was contacted by anonymous individuals—believed to be IRGC agents—who offered to ransom Mr. Tahbaz's freedom in exchange for money. *Id.* at ¶ 22. Mrs. Tahbaz was also wrongfully prohibited from leaving Iran for the duration of Mr. Tahbaz's detention, and was further "subjected to other mistreatment by the IRGC." *Id.* at ¶ 24.

In defending against these charges, Mr. Tahbaz incurred more than $100,000 in legal fees. *Id.* Moreover, Mr. Tahbaz's extensive post-conviction relief efforts resulted in additional defense costs in excess of $2.2 million. *Id.* at ¶ 19. Additionally, "[d]ue to their wrongful detention, Mr. and Mrs. Tahbaz lost income exceeding [$4 million] and incurred substantial medical and psychiatric expenses." *Id.* at ¶ 25. Plaintiffs claim coverage for these costs under the Policies.

<u>Defendants' Denial of Coverage</u>

Plaintiffs' family provided Defendants with timely notice of the aforementioned losses and injuries suffered by Plaintiffs, and demanded coverage under the Policies. *Id.* at ¶ 51. Defendants denied coverage, asserting, *inter alia*, "that trade and economic sanctions imposed by the Office of Foreign Assets Control ('OFAC') against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States barred all coverage for [Plaintiffs] because their wrongful detention occurred in Iran." *Id.* at ¶¶ 54–55.[1] Defendants were advised that their position was inconsistent with OFAC guidance. *Id.* at ¶ 55. Defendants refusal to provide coverage resulted in additional injuries to Plaintiffs, such as delayed compensation, psychological distress, and litigation costs. *Id.* at ¶ 56.

---

[1] While this may have been the reason communicated as to why coverage was denied, this is not the basis upon which Defendants move to dismiss the Complaint.

On January 9, 2024, Plaintiffs filed the Complaint, asserting claims arising from Defendants' denial of coverage.  ECF No. 1.  On March 20, 2024, Defendants filed the instant Motion to Dismiss ("MTD").  ECF No. 19.  Plaintiffs filed their opposition to Defendants' Motion to Dismiss ("Pls. Opp.") on May 9, 2024, and Defendants filed a reply brief ("Defs. Reply") on May 23, 2024.  *See* ECF Nos. 31, 36.

**Discussion**

This case boils down to a multi-layered coverage dispute.  Though Plaintiffs bring multiple claims, each derives from Defendants' denial of coverage under the Policies for the injuries suffered by both Plaintiffs in connection with their wrongful detention in Iran.  In their Motion to Dismiss, Defendants argue that under the unambiguous terms of the Policies: (1) Plaintiffs' Personal Liability coverage did not obligate Defendants to pay the defense costs for Mr. Tahbaz's criminal proceedings in Iran; (2) Plaintiffs' claims for Kidnap Expenses and Family Protection coverage are excluded under the plain language of the Homeowners Policy; (3) any claims for coverage under Plaintiffs' Umbrella Policy fail because the primary Homeowners Policy does not cover Plaintiffs' claims; (4) Plaintiffs' claim for Uninsured/Underinsured coverage under the Umbrella Policy fails because the Complaint does not plead a specific legal entitlement to any damages caused by IRGC agents; and (5) Plaintiffs' bad faith and CUIPA/CUTPA claims fail as a matter of law in light of the foregoing, and are otherwise insufficiently pleaded.  In response, Plaintiffs dispute Defendants' reading of the Polices and assert that they have properly pleaded each of their breach of contract claims, as well as their breach of the duty of good faith and fair dealing and CUIPA/CUTPA claims.  The Court agrees with Plaintiffs as to Counts One through Three, and with Defendants as to Counts Four through Six.

<u>The Breach of Contract Claims (Counts One through Four)</u>

Because this is a diversity case, the Court applies Connecticut substantive law. *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) (federal courts sitting in diversity apply the substantive law of the forum state). "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 114 (D. Conn. 2014) (citing *Flagstar Bank, FSB v. Ticor Title Ins. Co.*, 660 F. Supp. 2d 346, 350 (D. Conn. 2009)).[2] "Under Connecticut law, the interpretation of an insurance policy is a question of law for the court." *Arrowood Surplus Lines Ins. Co. v. Westport Ins. Corp.*, No. 3:08-CV-1393 (AWT), 2010 WL 56108, at *2 (D. Conn. Jan. 5, 2010), *aff'd sub nom. Arrowood Surplus Lines Ins. Co. v. Westport Ins. Co.*, 395 F. App'x 778 (2d Cir. 2010) (citing *Pac. Indem. Ins. Co. v. Aetna Cas. & Sur. Co.*, 240 Conn. 26, 30 (1997)). "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy [and] [t]he policy words must be accorded their natural and ordinary meaning[.]" *Aetna Cas. & Sur. Co.*, 240 Conn. at 29 (internal quotation marks omitted). Significantly, the Court "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result . . ." *Arrowood Indem. Co. v. King*, 304 Conn. 179, 187 (2012). "Contract language is to be interpreted 'with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.'" *Arch Ins. Co. v. Centerplan*

---

[2] Defendants do not contest that the Complaint adequately alleges the formation of an agreement, performance by Plaintiffs, and damages. Indeed, the instant Motion to Dismiss is premised solely on Plaintiffs' allegations as to Defendants' purported breach of the agreement.

*Constr. Co., LLC*, No. 3:16-CV-1891 (VLB), 2018 WL 6519063, at *5 (D. Conn. Dec. 11, 2018)

(quoting *Southington v. Commercial Union Ins. Co.*, 71 Conn. App. 715, 725 (Conn. App. Ct.

2002)). Under Connecticut law, "[b]ecause it is the insurance company that has drafted the terms

of the insurance policy, any ambiguity contained therein is traditionally construed against the

insurer and in favor of insurance coverage." *Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp.

3d 394, 405 (D. Conn. 2017) (quoting *S&S Tobacco & Candy Co. v. Greater N.Y. Mut. Ins. Co.*,

224 Conn. 313, 320 (1992)). However, "the mere fact that the parties advance different

interpretations of the language in question does not necessitate a conclusion that the language is

ambiguous . . ." *Aetna Cas. & Sur. Co.*, 240 Conn. at 30. But "when the words of an insurance

contract are, without violence, susceptible of two equally reasonable interpretations, that which

will sustain the claim and cover the loss must, in preference, be adopted." *R.T. Vanderbilt Co. v.

Cont'l Cas. Co.*, 273 Conn. 448, 462 (2005) (internal quotations and alterations omitted). Finally,

the Court will not "torture words to import ambiguity where the ordinary meaning leaves no room

for ambiguity[.]" *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 584 (1990) (internal

quotation marks omitted).

Plaintiffs' breach of contract claims challenging Defendants' denial of coverage are each

predicated on a distinct coverage provision in the Policies. The Court addresses each in turn.

### Personal Liability (Count One)

Under the Policies' Personal Liability coverage, Defendants are "required to pay damages

a covered person is legally obligated to pay for personal injury or property damage caused by an

occurrence and to 'defend a covered person against any suit seeking covered damages for personal

injury or property damage.'" Compl. at ¶ 58. In seeking dismissal, Defendants assert that the

IRGC Show Trial was not a "suit;" and did not result in "damages;" for any covered "personal

injury" within the meaning of the Policies, and that accordingly, the IGRC Show Trial does not trigger Personal Liability coverage.  *See* MTD at 7–9.  In response, Plaintiffs offer an interpretation of the Policies that would trigger coverage under this provision.

<u>"Suit"</u>

The Policies do not define "suit."  As such, citing Black's Law Dictionary (11th ed. 2019), Plaintiffs urge the Court to adopt a broad meaning of the term, to encompass "[a]ny proceeding by a party or parties against another in a court of law," which on its face would include the IRGC Show Trial.  Pls. Opp. at 9.  Of no surprise, Defendants seek a narrower definition, one which limits "suits" to an "attempt to recover a right or claim through legal action,"  MTD at 7, which they argue clearly would not encompass the criminal proceedings in Iran.  The parties each posit a rational meaning of the term.  For the Plaintiffs, it is reasonable enough to construe "suit" as encompassing a criminal proceeding, and Defendants do not cite any authority that such a reading is without foundation.  Likewise, it is also reasonable to understand "suit" to encompass only civil actions or enforcement efforts, so as to exclude criminal trials and proceedings.  However, had Defendants wanted or intended to exclude coverage for costs or losses deriving from criminal proceedings, they could have done so.  *See McAnanch v. Wintermute*, 491 F.3d 759, 772 (8th Cir. 2007).  As a result, the Court concludes that the term is ambiguous.  *See Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 164 (D. Conn. 2014) (if the parties' competing interpretations of a term are both reasonable, the term is ambiguous).  "Because two equally reasonable definitions of the term "suit" exist, the broad definition must, in preference, be adopted because it will sustain the claim

and cover the loss." *R.T. Vanderbilt Co.*, 273 Conn. at 465.[3]  The Court sees no reason to deviate

from this established principle here.  *See Roberts*, 264 F. Supp. 3d at 405.

### "Damages"

As for "damages," it is defined under the Policies' as a "sum that is paid or is payable to

satisfy a claim . . . resolved by judicial procedure."  Here, Defendants urge that the IRGC's

$600,000 purported "monetary judgment" did not seek compensatory payment for an injury

covered by the Policies, and was rather, a criminal fine.  *See* Defs. Reply at 2.  Plaintiffs argue that

the $600,000 "monetary judgment" sought and secured against Mr. Tahbaz through the IRGC

Show Trial fits squarely within the policy definition.  While insurance companies can and often

do limit damages to those awarded in civil proceedings, the Policies here fail to do so.  *See* 7A

Couch on Ins. § 103:40 ("A policy of liability insurance often excludes from coverage 'violations

of law,' 'criminal acts,' and the like. Such provisions are valid.").  Thus, at best, the term

"damages" is also ambiguous, and the policy will be construed in favor of coverage.

### "Personal Injury"

Under the Policies, "personal injury" means, *inter alia*, injuries resulting from "wrongful

entry or eviction."[4]  Though "wrongful entry" itself is not defined under the Policies, "it is a basic

principle of insurance law that policy language will be construed as laymen would understand it .

. ." *R.T. Vanderbilt Co.*, 273 Conn. at 462–63.  Plaintiffs allege that the IRGC's allegations against

Mr. Tahbaz—in particular, that he "engaged in acts of espionage, including illegally accessing and

---

[3]  In *R.T. Vanderbilt,* the Connecticut Supreme Court determined that the term "suit" in an insurance policy was ambiguous as both parties were able to fashion a definition that was reasonable.  *R.T. Vanderbilt Co.*, 273 Conn. at 465.  Although the dispute in *R.T. Vanderbilt* was not whether coverage for suits extended only to civil, versus criminal, proceedings, the Court's assessment of the competing interpretations and definitions certainly resonates here. *See id.*  And ironically, the language from *R.T. Vanderbilt* relied upon by Defendants to *narrow* the definition of a suit, was the language relied upon by the Supreme Court in affording the term a broad and expansive meaning.

[4]  The Policies identify specific claims founded in tort as falling within the scope of coverage.  "Wrongful entry or eviction" is the tort claim Plaintiffs cite as applicable here.

collecting information within numerous sensitive sites in Iran"—constitute "wrongful entry" within its ordinary meaning, and thereby satisfy the Policies' definition of "personal injury." Compl. at ¶ 59. In seeking dismissal, Defendants emphasize that "the gravamen of [IRGC's] charge is espionage—not wrongful entry," and argue that "under no reasonable interpretation can this charge be 'accurately characterized' as a suit for 'wrongful entry.'" MTD at 8. In response, Plaintiffs contend that it is the facts alleged by the IRGC, not the title of the charge, that dictate Defendants' obligations under their duty to defend, and that here, the crux of the IRGC's allegations were that Mr. Tahbaz entered property where he was not permitted and engaged in misconduct on that property.

Essentially, Plaintiffs seek a broad construction of "wrongful entry" that permits an evaluation as to the factual basis for the IRGC's espionage charge, while Defendants urge that Mr. Tahbaz's espionage charge was clearly not listed in the Policies and caution the Court against expanding the list of torts covered by the Policies to include a charge not specifically enumerated therein. The parties' arguments each find support in the case law. *Compare Allstate Ins. Co. v. Neleber*, No. 3:14-CV-629 (DJS), 2015 WL 5442828, at *4 (D. Conn. Sept. 15, 2015) ("a duty to defend is determined by the facts in the underlying complaint, not the titles assigned to various counts") (citation omitted) *with Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 92 (D. Conn. 2017) ("[p]ersonal injury coverage can only trigger an insurance company's duty to defend against the claims that are listed in the contract."). The Court agrees with Plaintiff. In assessing whether coverage is available for claims arising out of "wrongful entry" by an insured, Courts do examine the nature of the underlying conduct giving rise to the liability. *See, e.g.*, *Kostin v. Pac. Indem. Co.*, No. 3:17-CV-1320 (JBA), 2018 WL 1747047, at *3 (D. Conn. Apr. 10, 2018) (Although accepting the argument that "wrongful entry" could encompass matters of trespass to

both real and non-real property, plaintiff's claims still failed because "the gravamen of [p]laintiff's claim does not involve any type of unauthorized intrusion"); *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 561–62 (2002) (Rejecting the argument that pollution claims derive from a "wrongful entry" insofar as "coverage under the personal injury endorsement provision in question was intended to reach only *purposeful acts* undertaken by the insured"); *Spaziani v. Harleysville Worcester Ins. Co.*, No. CV044000309S, 2005 WL 1273897, at *3 (Conn. Super. Ct. May 4, 2005) (insured entitled to receive a defense for wrongful entry suit alleging he wrongfully towed a car from someone's property, "no matter what legal theory the facts are squeezed into").

Plaintiffs have adequately alleged that the IRGC Show Trial resulted from Mr. Tahbaz's unlawful intrusion into sensitive Iranian sites sufficient to bring the claim within the Personal Liability provision for "wrongful entry." *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) ("[f]act-specific questions cannot be resolved on the pleadings.") (citation omitted).

Defendants seek to dismiss Count One because the Policies, unambiguously, do not provide coverage for Plaintiffs' legal fees or the "monetary judgment" in connection with Mr. Tahbaz's criminal prosecution. As set forth above, the Court disagrees. Plaintiffs' allegations, if

proven, would trigger coverage.[5]  Plaintiff has adequately alleged that the IRGC Show Trial falls within the Personal Liability coverage.  The Motion to Dismiss as to Count One is **DENIED**.

*Kidnap Expenses and Family Protection (Counts Two and Three)*

Turning to Counts Two and Three, the Complaint alleges that under the Policies' Kidnap Expenses and Family Protection coverage, respectively, Defendants were obligated to cover: (a) "expenses incurred as the result of the actual or alleged wrongful taking of a covered person that includes a demand for ransom payment and occurs 'anywhere in the world except those places listed on the United States State Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence'"; and (b) "expenses incurred as a result of an unlawful act of violence or threat of violence to a covered person by a person who unlawfully entered the covered person's temporary residence while a covered person was present."  *See* Compl. at ¶¶ 64, 71.  Plaintiffs allege that Mr. Tahbaz's kidnapping and the IRGC's subsequent ransom demand, as well as the IRGC's unlawful entry and ransacking of Mr. and Mrs. Tahbaz's temporary residence in Iran, entitle them to coverage under the Policies.  *Id.* at ¶¶ 67, 73.

Defendants' argument for dismissal is two-fold.  First, Defendants argue that Count Two and Three should be dismissed because the Policies' coverage for Kidnap Expenses and Family Protection excludes occurrences caused by a "civil authority."  Therefore, Defendants posit, the

---

[5]  Defendants also argue that the Umbrella Policy only covers "damages that a covered person is legally obligated to pay for personal injury or property damage."  Thus, they argue, Plaintiffs' breach of contract claims with respect to the Umbrella Policy fail for this additional reason.  In advancing this argument, Defendants essentially ask this Court to strike or eliminate portions of Plaintiffs' claims even if other portions remain in the case.  But it is not for this Court to dissect Plaintiffs' claims and excise allegations which purportedly run afoul of the policy provisions.  Plaintiffs do not bring separate claims under each policy.  Each breach of contract claim is brought under both policies.  Courts generally decline to dismiss only portions of a cause of action.  *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 101 (E.D.N.Y. 2018) ("As the Second Circuit has long held, 'part only of a single claim cannot be adjudicated with finality.'") (quoting *Rieser v. Baltimore & Ohio R.R. Co.*, 224 F.2d 198, 204 (2d Cir. 1955)); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original).

kidnapping, wrongful detention, and ransacking of the Plaintiffs' home by the IRGC are not covered occurrences insofar as the IRGC was acting on behalf of a "civil authority," to wit, the government of Iran.   MTD at 11.   Second, Defendants argue that because both the Kidnap Expenses and Family Protection coverage excludes losses occurring in "those places listed on the United States Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence," and that "Iran was on the U.S. State Department's Travel Warning/Travel Advisories list at all relevant times," Defendants had no coverage obligation.

<u>"Civil Authority"</u>

The Policies do not provide coverage for "expenses incurred due to any kidnap and ransom occurrence caused by a . . . civil authority, or any person acting on behalf of [a civil authority]." *See* Defs. MTD, Ex. A at 24.   Though neither "civil authority" nor "on behalf of" are defined under the Policies, Defendants urge that the IRGC and/or its agents were plainly acting on behalf of a "civil authority," namely, the Iranian government.   Plaintiff offers a narrower definition of "civil authority," one which would not include the military arm of a government.[6]

As an initial matter, the term "civil authority," is not defined in the Policies.   In this context, the Court finds the term ambiguous.   Defendants contend that "civil authority" is defined as "a person who exercises authority over civilian affairs," and cite a number of non-binding decisions, as well as a statement from the Office of the Director of National Intelligence, describing the IRGC as an armed force under the ultimate command of the Iranian government.   *See* MTD at 10–11. Plaintiffs argue that "civil authority," in the insurance context, is commonly understood as referring to firefighters, police, etc., not military authorities like the IRGC.   Pls. Opp. at 14.   To

---

[6] Plaintiffs appear to, in part, misconstrue Defendants' argument.   Defendants contend that the "civil authority" exclusion is triggered here because the IRGC was acting *on behalf of* a civil authority (*i.e.*, the Iranian government), not that the IRGC is itself a civil authority.   *See* MTD at 10.   Regardless, for the reasons discussed *infra*, the Court finds that the term "civil authority" is ambiguous, and as such, shall be construed in favor of coverage at this stage.

that end, Plaintiffs additionally urge that insurance policies tend to "include separate and explicit reference to military authorities if their actions are also covered," and here, such a limitation can be found in the Policies' separate "Acts of War" exclusion.[7]  *See id.* Moreover, Plaintiffs emphasize that the Defendants certainly could have explicitly included military authority as either falling within the scope of civil authority or as a separate basis for exclusion.  *See, e.g.*, *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108 (E.D.N.Y. 2021) (Policy at issue expressly covered both civil and military authority); *Cipriani USA Inc. v. Hartford Fire Ins. Co.*, No. X07HHDCV226153989S, 2023 WL 4882662, at *2 (Conn. Super. Ct. July 27, 2023) (same).  Ultimately, the Court finds both interpretations of "civil authority" to be reasonable.  Indeed, it is unclear whether the scope of "civil authority" under the Policies includes military and/or security forces acting on behalf of a foreign government, or if it is more limited as posited by Plaintiffs.  Thus, at this stage, the term shall be construed in favor of coverage.  *See Roberts*, 264 F. Supp. 3d at 405.

As to "on behalf of," though Defendants emphasize the close connection between the IRGC and the Iranian government, Plaintiffs allege that here, the IRGC detained Mr. Tahbaz even though he "had been performing lawful volunteer work with the express authorization of the Iranian civil government and in collaboration with the Iranian Ministry of the Environment . . ."  *See* Compl. at ¶ 15.  Thus, based on Plaintiffs' allegations—which must be taken as true—the Court finds that whether the IRGC was acting "on behalf of" the Iranian government is a factual question unfit for resolution at the pleadings stage.  *See Int'l Code Council*, 43 F.4th at 53.

---

[7]  Pursuant to this exclusion—which Defendants do not invoke—there is no coverage for "any damages caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions." *See* MTD, Ex. A at 32.

Travel Warnings List

The parties do not dispute that the Kidnap Expenses and Family Protection coverage expressly excludes wrongful takings and home invasions occurring in "those places listed on the United States State Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence" (the "Travel Warnings list"). Plaintiffs allege, however, that Iran did not appear on any such list on January 10, 2018, the date of Mr. Tahbaz's kidnapping. *See* Compl. at ¶ 66. Defendants disagree, asserting that Iran had been on the Travel Warnings list, and when the U.S. State Department released its updated, functionally equivalent "Travel Advisory" system on January 10, 2018, Iran was categorized as "Level 4, Do Not Travel." MTD at 10–11. This issue cannot be decided on the pleadings.

As an initial matter, Plaintiffs are correct that Defendants do not specifically cite or produce the precise Travel Warnings list referenced in the Policies. Instead, Defendants maintain that Iran was on that list prior to January 10, 2018, and that the updated, functionally equivalent Travel Advisory system—which lists Iran as "Level 4, Do Not Travel"—obviates Defendants' coverage obligation. But even accepting that Iran was on the Travel Warnings list before it was phased out, Defendants seemingly ignore that under the updated Travel Advisory system, *every country in the world* is listed and assigned a "Level" between 1 and 4, with "Level 4" meaning "Do Not Travel." In this regard, assuming the Travel Advisory system was in place when Mr. Tahbaz was kidnapped,[8] coverage could arguably be excluded altogether under the Policies, regardless of whether the events occurred in Iran or some comparatively safer country for travel, *e.g.*, Canada.

---

[8] Defendants further urge that even if the Travel Warnings list was functionally distinct from the Travel Advisory system, the Policies' exclusion still applies because Mr. Tahbaz was arrested in Iran "on the last day that the previous Travel Warnings system was in place," *i.e.*, January 10, 2018. But it is far from clear when precisely on January 10, 2018 the Travel Warning list was phased out and the Travel Advisory system went live. And in any event, there is no basis for the Court to resolve these purely factual questions at this juncture.

Thus, while the Travel Warning and Travel Advisory systems may seek to achieve the same goal, the Court cannot find, at this stage, that they are each other's functional equivalent in the context of the Policies.  And while Defendants summarily re-write the Policies to address the new Travel Advisory System, it is utterly unclear to this Court how the updated Travel Advisory system fits within the language and scope of the Policies as written.  The exclusion therefore might have no application if there was no "Travel Warnings List" on January 10, 2018, *see supra* n.7, or alternatively, there is ambiguity as to whether and how the replacement system applied under the terms of the Policies.  Again, ambiguity must be construed against the insurer and in favor of coverage.[9]  *See Roberts*, 264 F. Supp. 3d at 405.  If Defendants establish that the Travel Warning list contemplated under the Policies was in effect on January 10, 2018, Defendants may renew this argument at the summary judgment stage.

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED** as to Count Two and Count Three.

### *Uninsured/Underinsured Liability (Count Four)*

Next, the Complaint alleges that because the Uninsured/Underinsured Liability section of Plaintiffs' Umbrella Policy covered certain amounts that a covered person is "legally entitled to receive from an uninsured or underinsured negligent person,"[10] Defendants were required to pay

---

[9]  Defendants additionally contend that the Travel Warnings list was in place prior to Plaintiffs' departure for Iran and thus, they would have been aware and expected, before traveling to Iran, that the policies did not cover occurrences there.  Defs. Reply at 5.  However, the Court declines to consider this argument insofar as it was raised for the first time in Defendants' reply brief.  *See Mateo v. Bristow*, No. 12-CV-5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("[i]t is well established, however, that a court should not 'consider arguments that are raised for the first time in a reply brief.'") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006)).  Further, it is utterly unclear how this argument has any bearing on the scope of coverage under the Policies.  Defendants' argument makes factual assumptions which they urge this Court to accept as true, and then having done so, summarily conclude that Plaintiffs are somehow estopped from seeking coverage.

[10]  The Umbrella Policy defines a negligent person as "an identifiable natural person by legal name . . . who is legally responsible for damages sustained by you or a family member caused by an occurrence."  Compl. at ¶ 48.

for the damages both Plaintiffs were legally entitled to receive from the IRGC agents that mistreated them.  Compl. at ¶¶ 47, 77–79.

Here, the parties appear to agree that because the phrase "legally entitled to receive" is not defined in the Umbrella Policy, Plaintiffs are required to demonstrate that they are entitled to recover damages from the IRGC agents "pursuant to the applicable statutes and regulations." *Williams v. State Farm Mut. Auto. Ins. Co.*, 229 Conn. 359, 366 (1994); *see also Prior v. Geico Indem. Co.*, No. CV186085828S, 2019 WL 4733427, at *4 (Conn. Super. Ct. Sept. 3, 2019).  The Complaint alleges that Plaintiffs' mistreatment in Iran amounted to actionable "false arrest, false imprisonment, or wrongful detention, wrongful entry or eviction, malicious prosecution or humiliation" for which various IRGC agents are legally responsible.  *See* Compl. at ¶ 78.  In seeking dismissal of this claim,  Defendants argue that: (1) Plaintiffs' conclusory allegations are insufficient to assert that they are legally entitled to recover damages; and (2) in any event, this Court plainly lacks personal jurisdiction over the IRGC and its agents, and thus, the IRGC and its agents could never be found legally liable to Plaintiffs.  MTD at 15–16.

In response, Plaintiffs argue that they would be legally entitled to recover against the offending IRGC agents under Iranian civil law in an Iranian court,[11] and that it is Plaintiffs' right to recovery, not the Court's personal jurisdiction, that governs their entitlement to coverage.  *See* Pls. Opp. at 20–21.  But Plaintiffs' argument misses the mark because, crucially, the Complaint itself fails to adequately allege Plaintiffs' entitlement to recovery from the IRGC agents (*i.e.*, the purported uninsured, negligent persons).  Indeed, the Complaint merely asserts, in conclusory

---

[11]  In support of this contention, Plaintiffs rely on a translated version of the Iranian Civil Liability Code from April 1960.  *See* Pls. Opp., Declaration of Daniel I. Wolf, Ex. A.  Defendants correctly observe, *inter alia*, that this transcription is not authenticated by a witness with knowledge of Iranian law.  Defs. Reply at 7–8.  Nevertheless, as discussed *infra*, Count Four is being dismissed on other grounds, to wit, Plaintiffs' failure to specifically allege their legal entitlement to recovery under Iranian civil law.

terms, that various IRGC agents are legally responsible for the personal injury caused to Plaintiffs by virtue of their false arrest, false imprisonment, or wrongful detention, wrongful entry or eviction, malicious prosecution or humiliation.  Compl. at ¶¶ 78–79.  The Complaint does not allege the particular "applicable statutes and regulations" which entitle Plaintiffs to  recovery from the IRGC agents.  *See Williams*, 229 Conn. at 366; *see also* Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.").  And it is well-established that Plaintiffs may not amend the Complaint through their opposition to the Motion to Dismiss.[12]  *See Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n.11 (S.D.N.Y. Sept. 30, 2021) ("it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).  Accordingly, the Court finds that Plaintiffs have not sufficiently alleged that they are entitled to recovery from the IRGC agents and that, as such, the Complaint does not adequately allege that Defendants breached the Policies by denying Plaintiffs coverage under the Uninsured/Underinsured Liability section.  The Motion to Dismiss Count Four is **GRANTED**.

<u>Breach of the Duty of Good Faith and Fair Dealing (Count Five)</u>

Plaintiffs allege that Defendants breached their implied duty of good faith and fair dealing when they wrongfully refused to satisfy their obligations under the Policies and otherwise failed to conduct an adequate investigation of Plaintiffs' claims before denying coverage.  Compl. at ¶ 84.  According to Plaintiffs, Defendants' conduct was "willful, malicious, without justification or excuse, and taken in bad faith."  *Id.*  In seeking dismissal, Defendants argue that Plaintiffs' good

---

[12]  Alternatively, Plaintiffs argue that the Court does have personal jurisdiction over the offending IRGC agents because "their misconduct toward Mr. Tahbaz was purposefully directed at the United States as part of Iran's program of taking hostages to use them as leverage in the U.S.-Iranian nuclear negotiations or to obtain the release of Iranians in prison in the United States."  *See* Pls. Opp. at 21 n.10 (citing *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 156 (D.D.C. 2017) (internal quotation marks omitted).  But once again, this argument is unavailing because these allegations are entirely absent from the Complaint.

faith and fair dealing claim must be dismissed because the Complaint asserts only conclusory allegations not entitled to the assumption of truth, and even if Plaintiffs' factual allegations are accepted as true, they fail to state a claim.[13]  The Court agrees.

"Connecticut 'recognizes a common-law duty of good faith and fair dealing between an insurer and its insured,'" and this common-law duty gives rise to a cause of action sounding in tort.  *See Nationwide Mut. Ins. Co. v. Pasiaki*, No. X08FSTCV094015401, 2011 WL 6413817, at *3 (Conn. Super. Ct. Nov. 30, 2011).  Connecticut law also implies into every contract a covenant of good faith and fair dealing.  *See*, *e.g.*, *Macomber v. Travelers Property & Cas. Corp.*, 261 Conn. 620, 638 (2002).  This, of course, includes contracts for insurance.  *See*, *e.g.*, *Heyse v. Case*, 114 Conn. App. 640, 652–53 (2009).

A Complaint must allege facts to support an inference that Defendants denied their claim "with a design to mislead or deceive another or by some interested or sinister motive."  *Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:19-CV-839 (JCH), 2020 WL 6888272, at *12 (D. Conn. Jan. 17, 2020) (internal quotation marks omitted).  "Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Buckman v. People Express, Inc.*, 205 Conn. 166, 171 (1987).  Allegations of mere negligence do not support an inference of dishonest purpose.  *Wadia Enterprises, Inc. v. Hirschfeld*, 224 Conn. 240, 248–49 (1992).  The lynchpin of a bad faith claim is a state of mind characterized by an intent to mislead or deceive or defraud.  *See id.* at 248.

---

[13] Defendants assert, as a threshold matter, that Plaintiffs' good faith and fair dealing claim, as well as their CUIPA/CUTPA claim (collectively, the "bad faith claims"), fail because Plaintiffs' contractual claims fail.  *See* MTD at 17.  However, insofar as the Court has herein determined that the Complaint adequately alleges a breach of contract, it will consider Plaintiffs' bad faith claims.

Here, Plaintiffs' wholly conclusory allegations fail to plausibly allege bad faith on the part of Defendants.  Indeed, as evidenced by the discussion *supra* regarding ambiguity in the terms of the Policies, the Court finds that this case clearly represents a good faith coverage dispute involving very unique circumstances.  *See McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 177 (D. Conn. 2005) ("a plaintiff cannot recover for bad faith if the insurer denies a claim that is 'fairly debatable,' *i.e.*, if the insurer had some arguably justifiable reason for refusing to pay or terminating the claim.").  Accordingly, the Court concludes that Plaintiffs have failed to plausibly allege a violation of the covenant of good faith and fair dealing.  Defendants' Motion to Dismiss is **GRANTED** as to Count Five.

CUIPA and CUTPA (Count Six)

In Count Six, Plaintiffs bring CUTPA claims premised on CUIPA violations.  Although CUIPA itself does not provide for a private right of action, "[a] plaintiff may assert a private cause of action based on a substantive violation of CUIPA through CUTPA's enforcement provision." *Belz*, 46 F. Supp. 3d at 165 (quotations omitted).  "To succeed in such a CUTPA claim, a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Id.* at 165 (citing *McCulloch*, 363 F. Supp. 2d at 181).  As relevant here, to state a CUTPA claim, Plaintiffs' must assert that Defendants' allegedly improper practices for denying insurance claims occur with such frequency as to amount to "general business practices."  CUIPA § 38a-816(6).

Plaintiffs allege that Defendants engage in a "custom and practice to deny coverage for claims involving an OFAC-sanctioned country even where such a denial is unsupported by any provisions of the OFAC sanctions or is inconsistent with OFAC guidance."  Compl. at ¶ 88.  But these assertions are conclusory and thus, not presumed to be true. *See Kirschner v. JP Morgan*

*Chase Bank*, 79 F.4th 290, 303 (2d Cir. 2023).  Indeed, in support of the purported unfair business practice, Plaintiffs rely entirely on Defendants' denial of coverage in this particular case and ask the Court to infer an unfair "custom and practice" therefrom.  It is well-established that a "plaintiff must show more than a single act of insurance misconduct; isolated instances of unfair settlement practices are not sufficient to establish a [CUIPA/CUTPA] claim."  *Karas*, 33 F. Supp. 3d at 117; *see also Courteau v. Tchrs. Ins. Co.*, 243 F. Supp. 3d 215, 218 (D. Conn. 2017) ("[I]t is essential that the Complaint allege that the defendant engaged in more than a single unfair act.").[14] Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to Count Six.

**Conclusion**

For all of the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.  Counts Four, Five and Six are dismissed.  This case shall proceed on Plaintiffs' breach of contract claims, as set forth in Counts One through Three.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of March 2025.

  */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[14]  Plaintiffs insist that general allegations of unfair business practices are sufficient, even absent specific allegations of insurer misconduct.  *See* Pl. Opp. at 23–24.  But as Defendants' accurately observe, Plaintiffs' argument invokes the incorrect pleading standard, and indeed, courts in this district have rejected the notion that allegations of a single unfair act are sufficient to state a CUTPA/CUIPA claim.  *See Belz*, 46 F. Supp. 3d at 166.